VIRGINIA-CAROLINA PEANUT COMPANY v. ATLANTIC COAST LINE RAILROAD COMPANY.

(Filed 30 May, 1914.)

**1. Interstate Commerce — Carriers of Goods — Rate Established— Rates Charged.**

The schedule of rates of freight filed by the carrier with the Interstate Commerce Commission and published and promulgated as the Federal statutes require, are controlling in interstate shipments of goods unless and until changed in accordance with the methods the statute directs; and are enforcible notwithstanding the agent of the carrier and the shipper may have agreed or contracted that a different rate should be charged.

2. Interstate Commerce—Carriers of Goods—Rates Established—
   Posting of Rates.

   It is not necessary to the effectiveness of the schedules of
rates that the copies of the same be posted in two public and
conspicuous places in every depot or station of the carrier, that
being a provision merely for the convenience of the public.

3. Interstate Commerce—Carriers of Goods—Rates Established—
   Filing with Commission—Publication—Inspection.

   The mere filing of a new or changed schedule of rates with the
Interstate Commerce Commission is only the initial step in
effecting a change of rates previously established, as it is neces-
sary under the Federal statute that they shall be likewise
"printed and kept open to public inspection," with further pro-
vision that they "shall not be effective until after thirty days
notice to the public, published as aforesaid," the publication re-
quired being as stated, that these schedules must be "printed
and kept open to public inspection"; it being further required,
though not as a part of the publication, that they be posted at
the various stations of the carrier for the greater convenience
of the public.

4. Interstate Commerce—Carriers of Goods—Rates Established—
   Changes—Requisites—Former Rates—Overcharges—Recovery.

   Where the agent of a carrier has agreed to accept interstate
shipments of merchandise in accordance with the schedule of
rates filed with the Interstate Commerce Commission and "pub-
lished" as required by the Federal statutes, these rates are not
affected by the fact that the carrier has filed a different schedule
of rates to effect a change in the rate so established, but which
at the time of the shipment had not been "published" in accord-
ance with the statutory requirement; and where the shipper has
accordingly been required to pay a higher rate for the shipment,
he may recover it back from the carrier, as an illegal overcharge
involuntarily paid by him, and as money received by the carrier
to his use, it having been wrongfully exacted from him.

5. Interstate Commerce — Carriers of Goods—Overcharge—Recov-
   ery—Courts—Commission—Concurrent Jurisdiction.

   It seems that the courts have concurrent jurisdiction with the
Interstate Commerce Commission of proceedings by the shipper
to recover the amount he has been required by the carrier to
pay in excess of the lawful rates established for the interstate
transportation of a commodity, and the shipper may have imme-
diate recourse to a State court. The difference between "publi-

cation" of schedules, as essential to the effectiveness of rates, and "posting" of them, as not essential thereto, pointed out and discussed by Walker, J.

Appeal by plaintiff from *Lyon, J.,* at December Term, 1913, of Martin.

This action was brought to recover the difference between the amount charged by defendant and that collected on shipments of peanuts during the period beginning with 1 January, 1908, and ending with 11 April, 1909, and heard on a case agreed. The shipments moved in interstate commerce from Williamston, N. C., to Philadelphia, Pa., and New York City. Defendant's agent at Williamston, on 1 January, 1908, quoted a class rate of 26 cents per 100 pounds, and afterwards refused to deliver certain of the goods to the consignees unless a commodity rate of 36 cents per hundred was paid. This was done and the goods released. The amount of the difference, estimated upon the basis of the number of pounds shipped by plaintiff, is $925.74. The following provisions are made in the Interstate Commerce Act:

"Section 6. Every common carrier subject to the provisions of this act shall file with the commission created by this act and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier by railroad, by pipe line, or by water, when a through route and joint rate have been established. . . . Such schedules shall be plainly printed in large type, and copies for the use of the public shall be kept posted in two public and conspicuous places in every depot, station, or office of such carrier where passengers or freight, respectively, are received for transportation, in such form that they shall be accessible to the public and can be conveniently inspected. The provisions of this section shall apply to all traffic, transportation, and facilities defined in this act. . . . No change shall be made in the rates, fares, and charges or joint rates, fares, and charges which have been filed and pub-

lished by any common carrier in compliance with the require-
ments of this section, except after thirty days notice to the Com-
mission and to the public, published as aforesaid, which shall
plainly state the changes proposed .to be made in the schedule
then in force and the time when the changed rates, fares, and
charges will go into effect; and the proposed changes shall be
shown by printing new schedules, or shall be plainly indicated
upon the schedules in force at the time and kept open to public
inspection: *Provided,* that the Commission may, in its discre-
tion and for good cause shown, allow changes upon less than the
notice herein specified, or modify the requirement of this section
in respect to publishing, posting, and filing of tariffs, either in
particular instances or by a general order applicable to special
or peculiar circumstances or conditions."

The Interstate Commerce Commission modified section 6 as
to time of notice, publication, and posting of rates, as follows:
"Every carrier subject to the provisions of the act to regulate
commerce (excepting those to which special and specific modi-
fications have heretofore been granted) shall place in the hands
and custody of its agent or other representative at every station,
warehouse, or office at which passengers or freight are received
for transportation, and at which a station agent or a freight
agent or a ticket agent is employed, all of the rate and fare
schedules which contain rates and fares applying from that
station or terminal, or other charges applicable at that station,
including the schedules issued by that carrier or by its author-
ized agent and those in which it has concurred. Such agent or
representative shall also be provided with all changes in, can-
cellations of, additions to, and reissues of such publications in
ample time to thus give to the public, in every case, the thirty
days notice required by the act. . . . Each of such carriers
shall also provide and cause to be posted and kept posted in two
conspicuous places in every station waiting-room, warehouse, or
office at which schedules are so placed in custody of agent or
other representative, notices (of schedules or tariffs) printed in
large type, according to form given in order."

The defendant had established a class rate of 26 cents on peanuts prior to 1 February, 1908, and on the latter day it filed with the Interstate Commerce Commission a new tariff, changing the former class rate to commodity rates of 36 cents on peanuts; but·it did not file these schedules with its agents or in its offices at the different stations on its line of railway for the purpose of being kept open for the inspection and information of the public, nor did it post the same at said stations, and the agent at Williamston had no such schedule, nor had he been notified of the same when the shipments were made.

The court gave judgment on the case agreed in favor of defendant, and plaintiff appealed.

*A. R. Dunning for plaintiff.*
*F. S. Spruill and·W. A. Townes for defendant.*

WALKER, J., after stating the case: This case involves the construction of section 6 of the Interstate Commerce Act. We have set out in the above statement so much of this act as relates to the matters in controversy. It is admitted in the case agreed that the rate of 26 cents per hundred pounds to Philadelphia, Pa., which was known as a class rate, was the lawful rate at the time the first shipment was made in January, 1908, and, as we will show, the tariff from which this quotation of the rate was taken remained in force throughout the period of the entire shipment of peanuts by interstate traffic moving from Williamston, N. C., and was in no way affected or changed, nor was it suspended by the supposed tariff of 1 February, 1908, so as to authorize the defendant to charge a greater rate for the shipment of the peanuts than was allowable under the tariff or schedule of rates which had been filed and published and was in force on and prior to 1 January, 1908, and this grows out of the fact that there is nothing in the case agreed to show that the tariff or schedule of "1 February, 1908, effective 2 March, 1908," was ever filed and published as required by the act. On the contrary, it is admitted "That said tariff was designated as No. 555, I. C. C. 6114, and that at no time prior to said date

(25 March, 1909) had said tariff been filed with the agent of
the Atlantic Coast Line Railroad Company at Williamston,
N. C., nor had he any notice thereof, nor had the Virginia-
Carolina Peanut Company or its officers had any notice thereof
until advised by the agent of the A. C. L. Railroad Company at
Williamston, N. C., on 11 April, 1909."

If the later tariff was in force, the defendant had not only
the right, but it was its duty, to charge according to its rates,
and it would have been illegal to have charged less. It had this
right, and this duty was imposed, notwithstanding it had quoted
a different and lower rate to the plaintiff, and he had actually
made all the shipments of his peanuts believing the lower rate
to be the true and lawful rate. And this is so, because to charge
a rate, even a lower rate, than the one fixed by its published
schedule, would be in direct violation of the provision of section
6 of the act prohibiting a carrier "to charge, demand, or collect
or receive a greater or less or different compensation for trans-
portation of passengers or property, or for any service in con-
nection therewith, between the points named in its tariffs, than
the rates, fares, and charges which are specified in the tariff
filed and in effect at the time; nor shall any carrier refund or
remit in any manner or by any device any portion of the rates,
fares, and charges so specified, nor extend to any shipper or per-
son any privileges or facilities in the transportation of passen-
gers or property, except such as are specified in such tariffs";
and the carrier is forbidden to engage or participate in the
transportation of passengers or property unless the rates, fares,
and charges for the same have been filed and published in ac-
cordance with the provisions of the act. Hamlin on Interstate
Commerce Acts, pages 11 and 12.

It has been held under this section that a carrier must require
payment of the lawful or published rate, even though its agent
had misrepresented the rate and it had agreed to take the goods
for shipment at a lower rate, the published rate being the only
lawful one. *Railway Co. v. Hefley,* 158 U. S., 98; *Railway Co.
v. Mugg,* 202 U. S., 242; *Railway Co. v. Abilene Cotton Oil Co.,*
204 U. S., 426; *Railway Co. v. Elevator Co.,* 226 U. S., 441.

In the last case cited it was held that "the rate fixed in the schedule filed pursuant to the act to regulate commerce is controlling, and it is beyond the power of the carrier to depart from such rates in favor of any shipper, and that the erroneous quotation of rates made by the agent of the railroad did not justify recovery, since to do so would be in effect enabling the shipper, whose duty it was to ascertain the published rate, to secure a preference over other shippers contrary to the act to regulate commerce." And in *Railway v. Mugg, supra,* it was held that a common carrier may exact the regular rate for an interstate shipment, as shown by its printed and published schedules on file with the Interstate Commerce Commission, and posted in the stations of such carrier, as required by the Interstate Commerce Act, although a lower rate was quoted by the carrier to the shipper who shipped under the lower rate so quoted. There are other cases in that court and many decisions by the Interstate Commerce Commission to the same effect, the latter being collected in Lust and Merriam's Digest of Decisions under the Interstate Commerce Act, pages 802 to 813.

The right of the plaintiff to recover the difference between the amount he was charged and that which he afterwards was required to pay in order to get his goods will depend upon whether the last schedule of rates was lawfully filed and published, and had become effective.

Much of the argument was spent upon the question whether compliance with the requirement that copies of the schedule of rates shall be kept posted in two public and conspicuous places in every depot or station so that they shall be accessible to the public and can be conveniently inspected, was necessary to the operation and effectiveness of the schedule. But it has been held not to be so in several cases: *Railway Co. v. Cisco Oil Mill,* 204 U. S., 449; *Railway v. Albus Commission Co.,* 223 U. S., 573; *U. S. v. Miller,* 223 U. S., 599. In the first case *Justice Van Devanter* said: "Although it was shown that the schedules embodying this rate were regularly printed, duly filed with the Interstate Commerce Commission, and kept open to public inspection at the freight offices of the garnishee at Kansas City

and other points, it was not shown that copies were posted in public and conspicuous places in those offices, as required by paragraph 6 of the Interstate Commerce Act. Posting, however, was not essential to make rates legally operative, and was required only as a means of affording special facilities to the public for ascertaining the rates *actually in force."* And in the second case *Justice White* said: "The requirement that schedules should be 'posted in two public and conspicuous places in every depot,' etc., was not made a condition precedent to the establishment and putting in force of the tariff of rates, but was a provision based upon the existence of an established rate, and plainly had for its object the affording of special facilities to the public for ascertaining the rates *actually in force.* To hold that the clause had the far-reaching effect claimed would be to say that it was the intention of Congress that the negligent posting by an employee of but one instead of two copies of the schedule, or the neglect to post either, would operate to cancel the previously established schedule, a conclusion impossible of acceptance." This construction of the act was confirmed in *Miller's case.* That proposition may, therefore, be taken as settled against the contention of the plaintiff.

But the serious question, and the pivotal one, still remains to be considered, and that is, Was the second of the schedules upon which defendant relies duly filed, published, and in force, so as to be applicable to the shipments? And upon this question we are with the plaintiff.

It is not sufficient, for the purpose of changing a schedule of rates or superseding an existing one, merely to file the new or changed schedule with the Interstate Commerce Commission. This, by itself, does not make it effective, but is only the initial step in that direction. The act provides that, in order to establish a lawful schedule of rates, it must not only be thus "filed with the Commission," but also "printed and kept open to public inspection"; and the provision, further on, in regard to changes in the schedule of rates, is that they "shall not be made except after thirty days notice to the public, *published* as aforesaid." (Italics ours.) What, then, is meant by the expression,

"published as aforesaid"?  It is apparent that these words imply
that in making an original schedule, "publication" of some kind
was essential to its validity and effectiveness.  If we refer again
to the first clause of section 6, we find that the schedule must
first be filed with the Commission, and then it must be "printed
and kept open to public inspection."  This requires distribution
to and among the different stations or depots at which the sched-
ule of rates must have effect, and this is the construction the
highest court has placed upon it.  The act, in this respect, is
obscurely worded, as no precise definition is given of the words
"published as aforesaid," or of the word "published," so that we
can know with perfect certainty what kind of publication was
intended; and therefore we must resort to interpretation.  It
evidently meant something more than mere "filing" with the
Commission, and the only other thing to which it can fairly and
reasonably be referred is the additional requirement that the
schedules shall be "printed and kept open for public inspection,"
and this is "promulgation and publication," as authoritatively
declared in *United States v. Miller*, 223 U. S., 599, in which the
Court said: "It is the contention of the defendants that a tariff
is not published in the sense in which the act uses that term
unless printed copies are 'kept posted in two public and con-
spicuous places in every depot,' etc., and it was this contention
that prevailed in the Circuit Court.  But, in our opinion, it is
not sound.  Publication and posting in the sense of the act are
essentially distinct.  This is the import of the provision that the
requirement relating to 'publishing, posting, and filing' may be
modified by the Commission in special circumstances, for if pub-
lishing included posting, mention of the latter was unnecessary.
And from all the provisions on the subject it is evident that the
publication intended consists in promulgating and distributing
the tariff in printed form preparatory to putting it into effect,
while the posting is a continuing act enjoined upon the carrier,
while the tariff remains operative, as a means of affording
special facilities to the public for ascertaining the rates in force
thereunder.  In other words, publication is a step in establish-
ing rates, while posting is a duty arising out of the fact that

they have been established.  Obviously, therefore, posting is not
a condition to making a tariff legally operative.  Neither is it a
condition to the continued existence of a tariff once legally
established.  If it were, the inadvertent or mischievous destruc-
tion or removal of one of the posted copies from a depot would
·disestablish or suspend the rates, a result which evidently is not
intended by the act, for it provides that rates once lawfully
established shall not be changed otherwise than in the mode
prescribed."  It appears, then, that "publication" means "pro-
mulgation and distribution," and is not confined to the mere
filing of the schedule with the Commission, it being something
besides that or in addition to it.  The Court manifestly had this
view of the act in mind when, through *Justice White,* in *Rail-
way Co. v. Abilene Oil Co., supra,* it said, at page 434 of 204
U. S.: "Although it is conceded that the evidence showed that
the schedule of rates was established and filed with the Inter-
state Commerce Commission and was kept at the station of the
railway company for public inspection, and that the oil company
had knowledge of the fact, it is insisted that the facts found do
not justify the conclusion that there was a compliance with the
requirements of the act to regulate commerce as to the posting
of the established schedule."  And also in the case of *Parsons v.
Railway Co.,* 167 U. S., at 459, where *Justice Brown* said:
"The allegation is that this joint tariff was not filed with the
Commission, and not published at the Iowa station from which
plaintiff made his shipment, and that, in consequence thereof,
he was ignorant of its rates."  It was said in *Railway Co. v.
United States,* 212 U. S., at 504, that the "legal and published
rate" is the only one the shipper is obliged to pay, and no other
can be exacted of him.  This view is rendered plainer by refer-
ence to the very terms of section 6 and the amendment of the
Interstate Commerce Commission.  There must be "thirty days
notice to the Commission and to the public as aforesaid (stating
the changes), and the proposed changes shall be shown by print-
ing new schedules, or shall be plainly indicated upon the sched-
ules in force at the time *and kept open to public inspection."*
(Italics ours.)  The words "kept open to public inspection," it

has been held, do not refer to the "posting of the schedules," and this is clear upon the face of the act, as separate provision is made for posting them, so that they will be accessible to the public. They can only refer, therefore, to publication. But the amendment of the Interstate Commerce Commission, authorized by the act, makes perfectly clear what is meant. It provides that the carrier shall place in the hands and custody of its agent at every station, warehouse, or office at which passengers or freight are received for transportation the schedules of all rates and fares "applying from the station or terminal, or other charges applicable at that station, and the same provision is made in regard to any and all changes in the schedules, and this is required to be done thirty days before the schedule or any change therein can become effective. Provision is then made for posting the schedules. Careful and minute provision is then made by the Commission to secure the polite and courteous attention of agents to the requests of shippers for an inspection of schedules filed in their offices. The publication intended by the act, therefore, is filing with the agents at the several stations the schedules, for public inspection, and this is what has been defined by the Court in *Miller's case* as "promulgation and distribution." Compliance with this requirement is made a condition precedent to the effectiveness of the schedules and the lawfulness of the rate charged thereunder. But the construction of the Court in *U. S. v. Miller* is unmistakable, and as defendant could not change the existing schedule, in which the rate was 26 cents, without a filing *and* publication of the change, and as this means "promulgation and distribution" among the several offices and stations of the carrier, where they are to be kept open for public inspection, *and also posted,* it has not complied with the law so as to make the later schedule effective, and therefore the charge should have been made according to the first schedule, that is, 26 cents per hundred pounds, car-load lots.

We entertain no doubt upon the other question in the case. Plaintiff has shown that the first tariff has continued in force because there has been no valid change made in it. The Com-

mission itself has held that the lawfully established rate remains in force until specifically and legally altered or rescinded. *Ohio Foundry Co. v. Railway Co.,* 19 I. C. C. Rep., 65, 67. This being so, plaintiff has paid to the defendant $925.74 more than it was entitled to receive at 26 cents per one hundred pounds, and this amount is recoverable in this action, as money received to plaintiff's use, it being an illegal overcharge.

Defendant's counsel argued that plaintiff had alleged and shown no damage sustained by him under section 8 of the act, providing that any common carrier violating the provisions of the act shall be liable to the person injured thereby in the full amount of damages sustained in consequence of any such violation. But this is an overcharge and not an unreasonable rate, which has been legally established, and for which another remedy is provided. It was said in *Railway Co. v. Abilene Cotton Oil Co.,* 204 U. S., at p. 436; "Without going into detail, it may not be doubted that at common law, where a carrier refused to receive goods offered for carriage except upon the payment of an unreasonable sum, the shipper had a right of action in damages. It is also beyond controversy that when a carrier accepted goods without payment of the cost of carriage or an agreement as to the price to be paid, and made an unreasonable exaction as a condition of the delivery of the goods, an action could be maintained to recover the excess over a reasonable charge. And it may further be conceded that it is now settled that even where, on the receipt of the goods by a carrier, an exorbitant charge is stated, and the same is coercively exacted either in advance or at the completion of the service, an action may be maintained to recover the overcharge. 2 Kent Com., 599, and Note a; 2 Smith Lead. Cas., pt. 1, 8 Ed., Hare & Wallace notes, p. 547." And in *R. R. v. Int. Coal Mining Co.,* 230 U. S., 184 (33 Supreme Ct. Rep., at p. 898): "The English courts make a clear distinction between overcharge and damages, and the same is true under the commerce act. For if the plaintiff here had been required to pay more than the tariff rate, it could have recovered the excess, not as damages, but as overcharge, and while one count of the complaint

asserted a·claim of this nature, the proof did not justify a verdict thereon, for the plaintiff admitted that it had only paid the lawful rates named in the tariff. Of course, no part of such payment of lawful rates can be treated as an overcharge or as an extortion." In the case of *Robertson v. Frank Brothers Co.,* 132 U. S., 17, excessive charges were demanded of an importer at the custom house, and he paid them in order to get possession of his goods. The Court held that the payment was not a voluntary one, but made under moral and illegal duress, and he was entitled to recover the amount of the excess over the lawful charge. *Justice Bradley,* delivering the opinion, and referring to *Maxwell v. Griswold,* 10 How., 242, said: "In that case, it is true, the fact that the importer was not able to get possession of his goods without making the payment complained of was referred to by the Court as an important circumstance. The ultimate fact, of which that was an ingredient in the particular case, was the moral duress not justified by law. When such duress is exerted under circumstances sufficient to influence the apprehensions and conduct of a prudent business man, payment of money wrongfully induced thereby ought not to be regarded as voluntary.· But the circumstances of the case are always to be taken into consideration. When the duress has been exerted by one clothed with official authority, or exercising a public employment, less evidence of compulsion or pressure is required—as where an officer exacts illegal fees, or a common carrier excessive charges. But the principle is applicable in all cases according to the nature and exigency of each." He also made reference to *Swift Co. v. United States,* 111 U. S., 22, where the Court, by *Justice Matthews,* stated that, in making a similar payment, the payer was under a moral duress, which prevented payment from being a voluntary one. The learned justice said, and this is quoted in *Robertson v. Frank Brothers Co., supra:* "The question is, whether the receipts, agreements, accounts, and settlements made in pursuance of that demand of necessity were voluntary in such sense as to preclude the appellant from subsequently insisting on its statutory right. We cannot hesitate to answer that question in the negative. The

parties were not on equal terms. The appellant had no choice. The only alternative was to submit to an illegal exaction or discontinue its business. It was in the power of the officers of the law, and could only do as they required. Money paid, or rather value parted with, under such pressure has never been regarded as a voluntary act within the meaning of the maxim *volenti non fit injuria.*"

. The Commission has held that "one of the leading prohibitions of the act is that against the exaction of an 'unreasonable' rate, and it is well settled that the Commission has authority to award reparation in case of the exaction of an 'unreasonable' rate. As against the carrier, its published tariff rate is conclusive of the fact that any higher rate is unreasonable. It seems fairly certain that in cases of the exaction of a rate higher than the published tariff, the shipper may bring his suit in court in the first instance; but the act also appears to give the Commission and the courts concurrent jurisdiction in this respect. An order will therefore be entered requiring defendant to pay to complainant the amount of the admitted overcharge."

We therefore conclude that the judgment against the plaintiff upon the case agreed was erroneous, and it is reversed, because it should have been for the plaintiff.

Reversed. ·