## C. E. SCHAFF, AS RECEIVER OF THE MISSOURI, KANSAS & TEXAS RAILWAY COMPANY, A CORPORATION v. J. C. FAMECHON COMPANY.[1]

February 6, 1920.

No. 21,597.

**Interstate carrier — filing tariffs.**

1. Under the interstate commerce rule a carrier is required to file with the commission its schedule of rates and tariffs, and to promulgate and distribute the same so that shippers may have access thereto and ascertain its terms.

**Special tariff for refrigerator must be published at place of origin.**

2. To establish and render operative a five dollar rental for a refrigerator car in which potatoes are shipped from points in Minnesota to points in Oklahoma, over connecting lines, the tariff schedule must be filed and published at the point of origin.

Action in the municipal court of Minneapolis to recover $25. The facts are stated in the opinion. The case was tried before Baldwin, J., who made findings and ordered judgment in favor of defendant. Plaintiff's motion for amended findings and conclusions or for a new trial was denied. From the judgment entered pursuant to the order for judgment, plaintiff appealed. Affirmed.

*D. R. Frost*, for appellant.

*Charles Burke Elliott* and *George Harold Smith*, for respondent.

QUINN, J.

Appeal from a judgment of the municipal court of the city of Minneapolis in favor of the defendant. The issue is whether a charge of five

[1]Reported in 176 N. W. 197.

dollars, in addition to the regular line haul rate, is collectible as rental for a refrigerator car in shipping potatoes by rail from points in Minnesota over connecting lines to points in Oklahoma and Texas.

During the fall and winter season, defendant loaded and shipped by rail in refrigerator cars, ordered in the usual course of business, seven carloads of potatoes from points in Minnesota to points in Oklahoma and Texas, over connecting lines. The Missouri, Kansas & Texas Railway Company, for which plaintiff is receiver, was the terminal carrier, and the Northern Pacific and Great Northern Railways, the initial carriers. The shipments were made as follows:

One car over the Northern Pacific from Rush City, Minnesota, to Muskogee, Oklahoma, in November, 1914.

One car over the Northern Pacific from Rush City, Minnesota, to Oklahoma City, Oklahoma, in January, 1915.

One car over the Great Northern from Grasston, Minnesota, to Muskogee, Oklahoma, in February, 1915.

One car over the Great Northern from Isanti, Minnesota, to McAllister, Oklahoma, in March, 1915.

One car over the Great Northern from Bock, Minnesota, to Sulphur Springs, Texas, in March, 1915.

One car over the Great Northern from Grasston, Minnesota, to Coalgate, Oklahoma, in February, 1916.

One car over the Great Northern from Isanti, Minnesota, to Durant, Oklahoma, in February, 1916.

The terminal carrier received the potatoes, delivered them at their destinations in the usual course of traffic, and collected from the shipper thereof, in excess of the regular line haul rate, the sum of five dollars on each shipment as rental for such refrigerator cars, excepting the one car shipped in 1914, where the excess was not collected. Thereafter defendant made claim against said railway company for an overcharge of five dollars on each of the four shipments so made in 1915, contending that the carrier was not legally entitled to collect a rental for such refrigerator cars. The railway company thereupon refunded to the defendant $20, which it claims to have done by mistake and a misunderstanding of the tariffs and schedules relating thereto. The plaintiff now seeks to recover five dollars rental for the car shipped in 1914, and the $20 so refunded.

Defendant, in its answer, puts in issue the allegations of the complaint and pleads a counterclaim for the rental paid on the two cars shipped in 1916. Defendant had judgment for $10 with interest and costs and plaintiff appeals.

For tariff purposes the country is divided into three sections, in each of which the carriers, by methods of their own, establish rates and charges applicable therein. The classifications enumerate commodities in an alphabetical list, and separate them into different classes as a basis for assessing and collecting freight charges. The western classification, generally speaking, governs shipments moving within territory west of the Mississippi river. In it are various subdivisions, one of which includes the southwestern lines with whose tariffs we have to do in the present case. The duly established freight rate on potatoes in carloads from points of origin to points of destination named in the pleadings, was contained in tariffs known as "Southwestern Lines' Tariffs." These tariffs were subject to the "Southwestern Lines' Classification Exceptions and Rules Circulars." It appears by stipulation that neither this circular nor the southwestern lines' tariffs circular was filed or published at any of the stations of origin, but that they were on file at certain designated offices of the Northern Pacific and Great Northern Railways in Minneapolis and St. Paul, and at various points in other states; that at the time the shipments were made, Western Trunk Line Circular No. 12 was on file at the points of origin and destination, and that it was the only tariff issued by any of the carriers participating in the transportation of the shipments in question which contained a five dollar rental provision for refrigerator cars; that such circular was printed and filed with the Interstate Commerce Commission and contained the following provision:

"Rule No. 3. Rental on Insulated Cars—When shipper orders a refrigerator or other insulated car to be heated by him or to move without heat, a charge of $5 per car per trip will be made for use of car and will accrue to the owner thereof."

. It is urged that the rental charge became effective and was collectible because of the provision of Circular No. 12 above quoted, when considered in connection with the Southwestern Lines' Classification Exceptions and Rules, which make specific reference to Circular No. 12, and which it is claimed modified the western classification so that shipments

transported thereunder were subject to such further charges as were contained in publications of participating carriers, on file with the Interstate Commerce Commission.

The trouble with this contention, so far as it might apply to the case at bar, is that neither the Southwestern Lines' Tariffs, nor the Southwestern Lines' Classification Exceptions and Rules, were, at the times in question, in the hands or custody of the agents of the initial carriers at the points of origin, nor had they been posted at such points. The Interstate Commerce Act, § 6, provides:

"That every common carrier subject to the provisions of this Act shall file with the Commission created by this Act and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier. * * * Such schedules shall be plainly printed in large type, and copies for the use of the public shall be kept posted in two public and conspicuous places in every depot, station, or office of such carrier where passengers or freight, respectively, are received for transportation, in such form that they shall be accessible to the public. * * *" (34 St. 586).

The western trunk lines do not include any of the southwestern lines which are subject to the southwestern lines' tariffs. And it is clear from the stipulation of the parties that the exceptions and rules circular was not kept at the stations of origin. To effectively establish a legal rate or charge, such as the rental here in question, a compliance with the provision of section 6 of the Interstate Commerce Law quoted, is essential, so far as relates to the publication of the schedules therein provided for. The rule of the commission, dated June 2, 1908, which was in force at the time of the shipments in question, provides:

"Every carrier, subject to the provisions of the Act to Regulate Commerce * * * shall place in the hands and custody of its agent or other representative at every station, warehouse or office at which passengers or freight are received for transportation, and at which a station agent, or a freight agent, or a ticket agent is employed, all of the rate and fare schedules which contain rates and fares applying from that station or terminal, or other charges applicable to that station, including the

schedules issued by that carrier or its authorized agent and those in which it has concurred."

The publication prescribed by this rule is a condition precedent to the establishment and putting into effect such rates. The publication is for the information and advantage of the public, for the inspection of the shippers at the various points throughout the country. Gulf Ry. Co. v. Hefley, 158 U. S. 98, 15 Sup. Ct. 802, 39 L. ed. 910; Atlanta, K. & N. Ry. Co. v. Horne, 106 Tenn. 73, 59 S. W. 134; Pecos River R. Co. v. Reynolds Cattle Co. (Tex. Civ. App.) 135 S. W. 162.

It seems to be well settled that the schedules must first be filed with the commission, and then they must be printed and kept open to public inspection at the various stations at which they were to have effect. U. S. v. Miller, 223 U. S. 599, 32 Sup. Ct. 323, 56 L. ed. 568; Virginia-Carolina Peanut Co. v. Atlantic Coast Line R. Co. 166 N. C. 62, 82 S. E. 1. In Oregon R. & N. Co. v. Thisler, 90 Kan. 5, 133 Pac. 539, it is said that the carrier is required to file schedules with the commission and promulgate them so that the shippers might have access thereto. Otherwise such rates do not become effective. Under the situation as it existed at the points of origin of the shipments under consideration, neither the station agent nor the shipper, by reference to any tariff schedules at their command, could discover that the Western Trunk Line Circular No. 12 was to be considered in connection with the rates or rental charges, with respect to shipments under the southwestern rate tariffs.

The Southwestern Lines' Exceptions and Rules Circular not having been on file at the points of origin, there were no tariffs on file to which shippers could refer to ascertain the rates of transportation, as we understand, containing any reference to the Western Trunk Line Circular No. 12. So there was nothing to indicate that circular No. 12 had in any manner to do with shipments over the southwestern lines or the tariffs pertaining thereto. It follows that the rates contended for had not become legally effective at the points in question.

Judgment affirmed.