This was a civil action, tried in the Superior Court of Guilford County. There is no controversy as to the facts, the same (388) being set out in the written agreement, and it being also further stipulated that if the defendant is indebted on account of the matters and things alleged in the complaint, the amount of such indebtedness is the amount demanded in the complaint.
The facts being admitted, the only question to be determined is whether, under the provisions of the published tariff "I. C. C., No. A-6895," the cotton shipped by the defendants was entitled to concentration and reshipment privileges mentioned in the tariff at Greensboro, and this is the subject of the single assignment of error. To put the question differently: Did this cotton, under the agreed facts, originate at Goldsboro or other stations on the Southern Railway, and was it "actually transit cotton, entitled to the reshipping privileges of Southern Railway Company under the rules contained in said tariff?"
The original rules in the tariff contain the following language: "Uncompressed cotton that has been concentrated at Greensboro, N.C. may be reshipped to destinations specified hereinafter when originating at stations on Southern Railway and other lines named herein, subject to the following rules:
"Rule 3 B. Bill of lading will be issued by the agent of this company, at Greensboro, N.C. for cotton reshipped to cover the movement from original point of shipment to final destination; and the original point of shipment must be shown on the face of the bill of lading.
"Rule 3 E. Way-bills issued to cover the cotton from Greensboro, N.C. shall show in the consignor's column the point of original shipment of the cotton and the way-bill number and date corresponding with the expense bills surrendered.
"Rule 4 B. Substitution of cotton brought in by wagons or by rail from nontransit points, or cotton brought in on transit rates, will not be permitted."
In the reshipping certificate to be signed by the shipper, the following language is used: "And is not wagon or river or other nontransit cotton." The substituted rules, effective 20 October, 1917, state: *Page 410 
"Rule 3 E. 1. To destinations specifically provided for in tariff, as amended, through rates lawfully on file with the interstate commerce commission (in effect on date of bill of lading covering movement from original point of shipment to Greensboro, N.C. will be applied from point of origin to such destination.)
"(b) Bill of lading will be issued by the agent of this line at Greensboro, N.C. for cotton reshipped to cover the movement from the original point of shipment to final destination; and the original point of shipment must be shown on the face of the bill of lading.
"(e) Way-bills issued to cover the cotton from Greensboro, (389) N.C. shall show in the consignor's column the point of original shipment of the cotton, and the way-bill number and date corresponding with the expense bills surrendered.
"Rule 4 A. (b) Substitution of cotton brought in by boats or wagons or by rail from nontransit points, for cotton brought in on transit rates, will not be permitted."
In order to have a better understanding of the case and the questions intended to be raised in it, we insert here a part of the case on appeal tendered by the plaintiff, appellant, with the agreement of the parties as to the facts:
That the defendant is a corporation, chartered and doing business under the laws of the State of North Carolina, engaged in buying, selling, shipping, and storing cotton. That during the year 1918, from time to time, the defendant alleged that it shipped a large number of bales of cotton from Goldsboro, N.C. and other points, to Greensboro, N.C. warehoused the same at Greensboro, and thereafter reshipped said cotton to points in and outside the State of North Carolina, claiming Goldsboro and other points of shipment mentioned as the point of origin of said shipments, and thus obtaining, under the provisions of Southern Railway Tariff I. C. C., A-6895, a copy of which tariff was attached to the complaint and made a part of it, a through rate of shipment from Goldsboro to the final point of destination to which said cotton was shipped. That, in fact, Goldsboro and the other points named were not the points of origin, and the defendant was not entitled to the through rate under the tariff, but should have paid a different and higher rate fixed for said shipments.
A complete list of the shipments, showing the pro number, the bill weight, the freight paid and received, number of bales, the weight of the portion of shipment not entitled to the through rate, the correct rate to be applied, the amount of freight which should have been paid and collected, the amount of undercharge, and the actual point of origin of each shipment was attached to the complaint. *Page 411 
The plaintiffs allege that by reason of the defendant obtaining an illegal and unlawful rate of freight upon said shipments, under the representation that Goldsboro and other points mentioned were the points of origin, under the provisions of said tariff, that the defendant was indebted to the plaintiffs, in addition to the freight that was paid by it, in the sum of $2,800.04.
The defendant filed an answer denying that Goldsboro and the other points referred to in the complaint were not the points of origin of the cotton alleged to have been shipped from Goldsboro and other points to Greensboro, and there warehoused, and thereafter reshipped to other points in and out of the State of North Carolina, and denying that defendant was not entitled to a through rate on shipments (390) to which said cotton was finally shipped; and denying that the defendant should have paid a different and higher rate than that paid by it; and denying that the defendant was indebted in any way to the plaintiffs for freight for the shipment of said cotton, after the same had been warehoused, under said tariff.
AGREED STATEMENT OF FACTS.
The plaintiff and the defendants in the above entitled cases, through their counsel of record, hereby agree to the following facts:
The first movement of each of the shipments of cotton shown on the schedules attached to the complaints in the above entitled actions was from the point or points indicated in the column in the extreme right of the sheets attached to said complaints, to Goldsboro or other station on the Southern Railway; that these shipments came over the lines of the Atlantic Coast Line Railway Company and the Norfolk Southern Railway Company, from the points indicated, to Goldsboro or other station on the Southern Railway; and that the freight thereupon was by defendants either prepaid to Goldsboro or other station on the Southern Railway, or paid upon arrival at Goldsboro or other station on the Southern Railway to said Atlantic Coast Line Railroad Company or said Norfolk Southern Railway Company. That at Goldsboro or other station on the Southern Railway the said Norfolk Southern Railroad and Atlantic Coast Line Railroad Company were receipted for the said shipments by the defendants, or the agent of the defendants; that thereafter the defendants or their agent procured said shipments to be delivered, in the same cars, seal unbroken, to the Southern Railway Company upon its tracks at Goldsboro.
Upon said cotton being delivered to the agent of the Southern Railway Company at Goldsboro, and upon its tracks, the Southern Railway accepted it for shipment to Greensboro, N.C. charging the local rate. *Page 412 
That upon arrival at Greensboro the shipment was warehoused, and later shipped out under the warehousing and reshipping privilege contained in Tariff I. C. C., A-6895, governing the concentration and reshipment of cotton.
Counsel for plaintiffs and defendant filed with the court an agreed statement of facts, which is the one above stated in full, and also further stipulated that if the defendant be found by the court to be indebted to the plaintiffs on account of the matters and things alleged in the complaint, the amount of such indebtedness, subject to errors of mathematical computation, is the amount demanded in the complaint. The case was submitted upon the agreed statement of facts and the stipulation mentioned above; and his Honor being of the opinion, after (391) considering the same, that under the facts agreed the shipment of cotton mentioned in the complaint originated at Goldsboro and other Southern Railway stations mentioned in the tariff, and that there were no further freight charges due the plaintiffs upon the same, and that the plaintiffs were not entitled to recover, rendered the judgment set out in the record.
The plaintiffs excepted to this finding of the court, and to the judgment signed in the cause, and appealed to the Supreme Court.
After stating the case, delivers the opinion of the Court: The above statement of the facts fairly presents the important question we must deal with in this case.
The language of the tariff and the rules we have cited preclude the idea or inference that any cotton other than that originating at a station on the Southern Railway, and named in the tariff, and which is the point of origin, should be entitled to concentration and reshipment privileges.
We are of the opinion that the legal meaning, under the tariff, of the words "originating at" and "point of origin" is that of the first point of shipment, the point from which the cotton was first shipped by freight, which, according to the agreed statement of facts, was from some station or stations on the Atlantic Coast Line Railroad Company, and not from Goldsboro or other points of the Southern Railway Company mentioned in the tariff, and hence that such cotton was not entitled to concentration and reshipment privileges, and reduction of charges, from Greensboro under said tariff schedule, and the fact that a new bill of lading for such cotton shipped from other points than those named in the tariff and over *Page 413 
other roads than the Southern Railway, was after its arrival at Goldsboro issued by the Southern Railway Company, to Greensboro, the point of concentration and reshipment, would not and could not, in law, make Goldsboro the point of origin of such cotton, nor would such cotton be that originating at Goldsboro, the only possible place of origin on the Southern Railway.
The shipment started at Mt. Olive, in the one case, and at other points of the Atlantic Coast Line and Norfolk Southern Railways, and in no sense, or in no admissible or practical sense, can it be deemed an original shipment of the goods from Goldsboro, or any other point or station of the Southern Railway, to Greensboro, the alleged place of concentration and reshipment to other distant points on other lines, they being their final destination. The Cyclopedic Law Dictionary defines the word "original" as that which is first in order; an authentic instrument of something, and which is to serve as a model or example to be copied or imitated. It also means first, or not deriving any (392) authority from any other source; as, original jurisdiction, original writ, original bill, and the like. And the same is said of the word, however it may be associated with a noun or substantive (such as, original shipment, original station, and other like use of it) in Black's Law Dictionary and Bouvier's Law Dictionary, and this meaning is generally if not universally assigned to it by all lexicographers. It is something that necessarily implies that there is nothing going before it, but it "starts things" always, the beginning, whatever and wherever may be the end, or the ending. With this accepted meaning of the word, how can it reasonably be asserted that the shipment in this case originated at Goldsboro? Take the shipment which started at Mt. Olive as typical of all of them. The cotton was brought from Mt. Olive to Goldsboro, and there turned over to the Southern Railway Company to be transported by it over its own line to Greensboro, without breakage of bulk, or any, even the slightest, interference with it. It remained in the same car into which it was loaded at Mt. Olive, and at other stations on the Atlantic Coast Line Railway line, and no part of it was removed therefrom or disturbed in any way, and it continued in that state and condition until it had made its journey, completed the same, and arrived at its destination in Greensboro. This being so, how can it be said, with any show of reason, that the mere giving by the agent of the Southern Railway at Goldsboro of what is called a bill of lading (really nothing more in effect than a receipt for the goods), and even the paying of the freight charges by defendant to that point, will by any possible argument or legal legerdemain convert into an original shipment from Goldsboro, which is on the line of the Southern *Page 414 
Railway Company, what in fact and in law is not one? The original point of shipment, in the case selected by us as typical, was Mt. Olive. The cotton was from the start evidently intended for a through shipment from Mt. Olive to Greensboro. Otherwise, if intended for Goldsboro, they would have been removed from the cars in which they were carried to that place and warehoused or taken away by the consignee for whom they were intended, and not left in the car intact and hauled to Greensboro in the same car, without molestation or change of any kind.
If the Southern Railway Company, as carrier, or Latham-Bradshaw Company, as cotton factors, or merchants, at Greensboro, had originally taken a bill of lading from the Atlantic Coast Line Railroad Company for a shipment of the cotton to Goldsboro and removed the same from the car, or had it removed, and warehoused at Goldsboro and then reshipped it by the Southern Railway line to Latham-Bradshaw Company at Greensboro, it may be that a different case would have been presented, though we do not venture any opinion as to that at this time, (393) as they did not do so, and, therefore, it would merely be a dictum if we did. We therefore decide only the case in hand, and the single question involved in it.
The defendant's counsel cited us to Chic. M. St. P. Ry. Co. v. Stateof Iowa, 233 U.S. 344, and that case, if not closely read and considered, might seem to lend some countenance to the position taken by defendant here, but when differently construed upon a more careful reading and upon greater deliberation, we can see several distinguishing features between that case and the one at bar. The Court there was dealing with several and various questions, one the construction by the State Court by which it felt that it was bound, another by the statement in the record of the case as it appeared in the State Court, and also in the Federal Supreme Court, "that the facts showed that the coal was originally consigned to the coal company in Davenport, that it was there held until sales were made, that the consignee had taken delivery, paying the freight to the initial carrier andassuming full control," citing 152 Iowa 317, 319. The latter Court said that "the record disclosed no ground for assailing this finding." In these respects, and some others not less striking or controlling, the two cases are quite different, and we are strongly inclined to think that the decision in that case, when properly construed, is an authority for our present decision in this case, instead of being in conflict with it, and our view seems to be that of those who are thoroughly familiar with such questions and regarded as experts in unraveling the usually confused and intricate meshes of railroad tariffs, which are more calculated to mislead than to enlighten the public. We *Page 415 
should be careful to see that by no mere form or device should railways, or their patrons, be permitted to violate the laws, in spirit or in truth, either of our own government or those of the Federal system, which are by our own and by the Constitution of the United States declared to be supreme. This attempt to transgress the law of the Federal Government by not complying with the lawful tariff approved by the Interstate Commerce Commission cannot be approved by us. We ourselves have held that such will not be permitted by this Court, but will be sternly rebuked.
We held in Peanut Co. v. R. R., 166 N.C. 62, 67, that it is the duty of a carrier to charge for freight strictly according to the published rates, and it is illegal to charge less. He had the right to charge the proper or established rate and the duty was imposed upon him to do so, notwithstanding he had quoted a different and lower rate to the plaintiff, who had actually made all the shipments of his peanuts believing the lower rates to be the true and lawful rate. And this is so, because to charge a rate, even a lower rate, than the one fixed by its published schedule, would be in direct violation of the provision of the Interstate Commerce Act, which prohibits a carrier "to charge, demand, or collect or receive a greater or less or different compensation for (394) transportation of passengers or property, or for any service in connection therewith, between the points named in its tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privilege or facilities in the transportation of passengers or property, except such as are specified in such tariffs," filed with and approved by the Interstate Commerce Commission, and the carrier is forbidden to engaged or participate in the transportation of passengers or property, unless the rates, fares, and charges for the same have been filed and published in accordance with the provisions of the act. Hamlin on Interstate Commerce Acts, pages 11 and 12. It has been held under the act that a carrier must require payment of the lawful or published rate, even though its agent had misrepresented the rate, and it had agreed to take the goods for shipment at a lower rate, the published rate being the only lawful one. PeanutCo. v. R. R., supra; Railway Co. v. Hefly, 158 U.S. 98; Railway Co. v.Mugg, 202 U.S. 242; Railway Co. v. Abilene Cotton Oil Co., 204 U.S. 426;Railway Co. v. Elevator Co., 226 U.S. 441. This doctrine of PeanutCo. v. R. R., supra, is approved and affirmed in R. R. v. Latham,176 N.C. 417, though the case is not cited. See, also, R. R. v. Mugg,202 U.S. 242; R. R. v. Birmingham Sand and Brick Co., 9 Ala. App. 419; *Page 416 R. R. v. New Albany, etc., Basket Co., 48 Ind. App. 647; Holt v. Wescott,43 Me. 445; Mfg. Co. v. R. R., 149 N.C. 261.
In the Mugg case, supra, the United States Supreme Court held that "A common carrier may exact the regular rates for an interstate shipment as shown by its printed and published schedule on file with the Interstate Commerce Commission and posted, etc., as required by the Interstate Commerce Act, although a lower rate was quoted by the carrier to the shipper who shipped under the lower rate so quoted." And in Central of Ga. v. Birmingham Sand and Brick Co., supra, the Court held that, under the Interstate Commerce Act, "the freight rate of an interstate shipment is not that named in the bill of lading or contract of shipment, but the lawful rate existing at the time, whether or not such rate is known to the consignor or the consignee, and regardless of whether the parties were misled by the carrier as to the lawful rate, or whether it had posted the lawful rate as required by the statute; hence, the carrier cannot by any act estop itself from demanding the lawful rate." All these cases, and others of a like tenor, are cited and approved inPeanut Co. v. R. R., supra, and R. R. v. Latham, supra. So that the law on this question is finally settled and established that if (395) the proper rate was not charged in this case, or less than the fixed rate was charged and received, the plaintiffs have the right to recover the amount of difference between the true and the false rate from the defendant.
In summing up, we may add that as the question in this case requires the construction of a written tariff rule of the Southern Railway Company, we must apply to its solution the invariable principle that the intention of the parties must govern and the meaning ascertained by finding what was meant by what was intended, and thus construed we deem it to be plain that Goldsboro was not regarded as an original point of shipment, and that defendant was not entitled to the lower rate, under the concentration and reshipment privilege.
We direct attention to original Rule 4 B, substituted for Rule 4 A (b), as designated in the record, which provides that "substitution of cotton brought in by boats or wagons, or by rail from nontransit points, for cotton brought in on transit rates will not be permitted," and to the principle as stated by the Court in Chic. Milw. St. Paul Rwy. Co. v.State of Iowa, supra, that the nature of the shipment must be determined by the essential character of the same, and not by the billing or rebilling, or by mere forms of contract. This case, in several respects, is clearly distinguishable from the one cited, and we are here dealing with quite a different question, and not only with the distinction between interstate and intrastate commerce, for where the former is not materially or *Page 417 
injuriously affected, the court lean towards the view that the commerce is intrastate, as we held in the Selma Station case, decided at this term, the latter case being strongly supported by C. M. and St. Paul Rwy. v. Iowa,supra.
We have found a case decided by the Interstate Commerce Commission upon facts somewhat similar to those in this one, where the commission held, and so decided, that the complainant, insisting upon the lower or concentration and reconsignment rate, upon facts, as to reconsignment, closely resembling those we have here, was not entitled to the reduction in rate because he had not actually taken possession of the goods at the designated place, so as to confer upon him the right of reconsignment to some other place beyond at the reduced rate. In order that the particular facts of that case and the decision of the commission may be clearly understood, we reproduce the same more extensively, as follows: "Two carloads of butter were shipped by complainant from Wellington, Ohio, and consigned to itself at Chicago. The local rate from Wellington to Chicago was 35 cents, and from Chicago to Evansville, 71 cents. Upon the arrival of the first car at Chicago, complainant sent a check for the freight at 35 cents, Wellington to Chicago. It was informed by defendant of an icing charge and was told that the entire charges might be paid at Evansville, to which arrangement complainant agreed, and reconsigned the car to Evansville. (396) Upon the arrival of the second car at Chicago, complainant merely reconsigned it to Evansville. The through rate of 71 cents was assessed on both cars. Reparation was claimed on the basis of 65.8 cents, the combination rate: Held, while a shipper had the right to consign a shipment to a given point, pay charges upon it, assume custody and take possession of the property, and later reship it to another point under rates lawfully applicable to such shipment, complainant was not entitled to reparation on the basis of the combination rate, since it did not reduce the property to its possession at Chicago," citing Wood ButterCo. v. C. C. C. and St. L. Ry., 16 Interstate Commerce Cases, pp. 374-375.
The case of R. R. v. Settle, Supreme Court Reporter (Adv. Sheets), vol. 43, No. 2, pp. 2831, while not "on all fours" with this case as to the facts, bears a sufficient resemblance to it generally and substantially as to be controlling in principle. A careful reading of that case will disclose a strong trend of judicial opinion, including the view of the highest Federal Court, adverse to defendant's contention in this case. Justice Brandeis there says: "In other words, Madisonville was at all times the destination of the cars, Oakley was to be merely an intermediate stopping place, and the original intention persisted in was *Page 418 
carried out. That the interstate journey might end at Oakley was never more than a possibility. Under these circumstances, the intention as it was carried out determined, as matter of law, the essential nature of the movement, and hence that the movement through to Madisonville was an interstate shipment; for neither through billing, uninterrupted movement, continuous possession by the carrier, nor unbroken bulk is an essential of a through interstate shipment. These are common incidents of a through shipment, and when the intention with which a shipment was made is in issue, the presence or absence of one or all of these incidents may be important evidence bearing upon that question. But where it is admitted that the shipment made to the ultimate destination has at all times been intended, these incidents are without legal significance as bearing on the character of the traffic. For instance, in many cases involving transit or reconsignment privileges in blanket territory, most or all of these incidents are absent, and yet through interstate tariffs apply. See R. R. v. Harold, 241 U.S. 371; R. R. v.United States, 245 U.S. 136; R. R. v. United States, 257 U.S. 247;42 Sup. Ct. 80; 66 L.Ed. ___. Compare R. R. v. Hancock, 253 U.S. 284. Through rates are ordinarily made lower than the sum of the intermediate rates. This practice is justified, in part, on the ground that operating costs of a through movement are less than the aggregate costs of the two independent movements covering the same route. But there may be traffic or commercial conditions which compel or justify (397) giving exceptionally low rates to movements which are intermediate. The mere existence of such intermediate rates confers no right upon the shipper to use them in combination to defeat the applicable through rate. Here there had been published interstate rates for the transportation from the southern points to Madisonville. For such transportation the interstate rates to Madisonville were the only lawful rates. To permit the applicable through interstate rate to be defeated by use of a combination or intermediate rates would open wide the door to unjust discrimnation, [discrimination,] and it would unjustly deplete the revenues of the carrier. The sole question, therefore, which could arise in this case was whether the movement actually entered upon at point of origin, and persisted in, was transportation of the lumber to Madisonville. Before the decisions above referred to, it was commonly assumed that while a carrier, or one of its employees, might not act as a reconsigning agent for a shipper, in order to enable him to use a combination of lower intermediate rates, and thus avoid the higher charges incident to the through interstate movement, the shipper might so use the combination, provided he consigned the car to himself at the intermediate point, there paid the charges, took possession, and then reshipped the car on the *Page 419 
local rate to its real destination. The distinction made was without basis in reason. To permit carriers' revenues from interstate rates to be depleted by such misuse of a combination of intermediate rates would be no less inconsistent with the provisions and purposes of the act to regulate commerce than to permit them to be used as a means of discrimination. And, since the decisions cited above were rendered, the principle there declared has been steadfastly applied by the Interstate Commerce Commission for the purpose of protecting revenues of railroads against such attacks. See, also, McFadden v. R. R., 241 F. 562. The decision in R. R. v. Texas,204 U.S. 403, relied upon by defendants in error, is entirely consistent with these later decisions of this Court, although some expressions in the opinion are not."
Looking at this transaction as it manifestly was intended to be, the shipment was one from Mt. Olive to the final destination, and the incidents of the journey relied on by the appellee corporation to convert it into one entitling it to a cheaper rate from Greensboro and to the contemplated and ultimate destination or end of the journey, are not sufficient to determine the true rate in its favor. They were nothing more, in substance if not in form, than devices planned and adopted for the single purpose, and with the illegal intent, to obtain the suggested advantage. To sustain that view would tend inevitably to encourage and make successful unjust discrimination and rebating, something denounced as unlawful and as "being inconsistent with the Federal (398) act to regulate commerce." The character of this movement was substantially and practically so continuous as to make it a through and unbroken carriage from Mt. Olive to the final destination of the goods, and therefore the regular rate applies. There can be no reasonable doubt as to the intention that the journey was intended from the start to be a continuous one from Mt. Olive to the final destination, with a stop-over at Greensboro in order to get the lower rate, and the stops at Goldsboro and Greensboro did not in law break this continuity. It is not pretended, and could not be, that defendants were present at Goldsboro to receive and reduce into their actual possession the cotton for any legitimate or authorized purpose. To hold that defendants were entitled to what they claimed would open the door wide to the evil practice which the law of Congress was intended to prohibit and prevent, and be a plain violation of the Interstate Commerce Act.
The argument and brief of the defendant's counsel were both able, learned, and interesting, but we cannot adopt the conclusion reached by them. This is not a theoretical question, but a practical one, and does not admit of hypothetical instances or artificial arguments or reasoning in the demonstration of it. *Page 420 
Goldsboro was not the original point of shipment within the meaning of the tariff, and the defendant must pay the difference between what is justly due under it, and what they have already paid, and judgment will be entered in the court below for the amount due as stipulated between the parties, which is the judgment that should have been rendered by the able and learned judge who presided at the trial. Let it be certified accordingly.
Reversed.